IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **JAMIEN PALMER, *et al.*,** | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Civil No. 1:22-cv-00899-CDA** |
| **STATE OF MARYLAND, *et al.*,** | * | |
| **Defendants.** | * | |
| | * * * | |

**<u>MEMORANDUM OPINION</u>**

BEFORE THE COURT is Plaintiffs' Motion for Class Certification.  ECF 84.  Four individuals filed this putative class action against the State of Maryland, two of its agencies, and an individual employee on behalf of individuals who were, allegedly, unconstitutionally overdetained at the Baltimore Central Booking and Intake Center ("Central Booking") after a commissioner or court ordered their release.  *See generally* Compl., ECF 1; Am. Compl., ECF 45.  The parties fully briefed the issues, and the Court heard oral argument on November 20, 2025.  ECF 99.  A short order indicated that the Court would grant the Motion.  ECF 100.  This memorandum opinion provides the Court's full reasoning.

## I.    BACKGROUND

On March 14, 2022, Plaintiffs Jamien Palmer, DeShawn Wilson, Clayton Rogers, and Beatrice Elmore (collectively, "Plaintiffs") brought this suit against the State of Maryland (the "State"), the Maryland Department of Public Safety and Correctional Services ("DPSCS"), the Maryland Division of Pretrial Detention and Services ("DPDS"),

and Frederick T. Abello, the former Warden of Central Booking ("Warden Abello") (collectively, "Defendants").

### A. THE CENTRAL BOOKING PROCESS

Central to this case is the State's alleged long-standing practice of unconstitutionally holding arrestees at Central Booking for unreasonable periods of time after a commissioner or court ordered their release. Central Booking processes all adults arrested in Baltimore City. Am. Compl. at ¶ 55. Central Booking's other functions include the "intake of charged individuals, their detention pending a decision on commitment, and their commitment, transfer, or release when ordered." Defs.' Opp'n to Mot. for Class Certification, ECF 94, at 7 ("Opp'n").[1]  After charged individuals are booked and fingerprinted, they appear before a District Court Commissioner, who determines whether they should be remanded, placed on bail, or released on their own recognizance. *Id*. When individuals are ordered released on their own recognizance, Central Booking personnel use a multi-step verification and release process involving three of its internal departments: a court unit, a records unit, and a correctional unit. *Id*. First, upon receiving a release order, the court unit creates the release packet and transmits it to the records unit. *Id*. at 7-8. Records unit staff review the release packet and, upon completing the review, enter the packet into the Offender Case Management System. *Id*. at 8. (This review period, characterized as Record Staff Approval Time, will be relevant to Plaintiff's definitions of "overdetention" as well as the proposed classes discussed later in this and

---

[1] Citations to the parties' memoranda use the page number noted at the bottom of the page. For any citations to documents other than memoranda of law, this opinion will use the page number assigned by the PACER / ECF system and indicated in the header at the top of the document's pages.

subsequent sections. *See id.*; Plaintiff's Reply, ECF 97, at 4 ("Pls.' Reply").) The Records Supervisor repeats the entire process for the purpose of ensuring accuracy. Opp'n at 8.

Next, the records staff calls a traffic officer to notify them that a detainee is prepared for release and needs an escort to the release area. *Id.* at 9. The detained individual gathers their belongings and is escorted to the Custody Release Housing Area. *Id.* At this point, the correctional unit processes the release package. *Id.* The correctional release officer reviews the paper packet for accuracy again and runs an ID check, which involves comparing fingerprints for identity purposes and checking for any outstanding warrants or other reasons why the individual should not be released at that time. *Id.* If the search reveals any such reasons or concerns, the staff delays release until the issue is investigated and cleared. *Id.* Next, the individual moves to the medical unit for a continuity of care check. *Id.* Once in the medical unit, the individual may refuse medical care instead of receiving prescriptions or other care deemed necessary. *Id.* Upon receiving clearance from the medical staff, the individual collects their property and returns to the custody release housing area. *Id.* at 10. Here, a Correctional Lieutenant performs a final verification, confirming that the individual's information matches the information in the Offender Case Management System and that there are no other detainers on file that would prevent release. *Id.* Upon clearance of this hurdle, the individual exits custody, and the release order's intent is achieved. *See id.*

Baltimore City Detention Center representatives provided testimony concerning the expected length of this process. Pls.' Mot. for Class Certification, ECF 84, at 5-7 ("Pls.' Mot."). In depositions conducted by Plaintiffs, DPSCS officials testified that "the release process should take no longer than four hours and an average of 2.5 hours or less after a court or commissioner directs release." Pls.' Mot. at 2 (citing Pls.' Ex. 1 at 96; Pls.' Ex. 2

at 26-27).  Some of the testimony reflects that the process for reviewing the file was unlikely to exceed 15 minutes, if even that long.  *See* Pls.' Mot. at 5 (citing Pls.' Ex. 7 at 31, 33, 34-36, 39; Pls.' Ex. 8 at 6-7, 16).  Other testimony indicates that releases should occur in less than two hours, if not much shorter.  Pls.' Mot. at 6.

### B.  PLAINTIFF'S THEORY OF OVERDETENTION AND CLASS CERTIFICATION

In 2019, through a suit brought pursuant to the Maryland Public Information Act (the "MPIA Litigation"), Plaintiff Jamien Palmer, represented by Plaintiffs' counsel in this suit, obtained documents from the State of Maryland relevant to, among other things, an alleged "'systemic failure to process and release incarcerated or confined individuals within a constitutionally permissive period of time following issuance of a'" release order. *See* Pls.' Mot. at 32 (quoting Order and Memorandum Opinion, *Palmer v. Dept. of Pub. Safety & Corr. Servs.*, No. 24-C-20-03017 (Md. Cir. Ct. Balt. City)).[2]  These records, according to Plaintiffs, reflect that "the entire process of clearing an arrestee for release can be completed in just 15 minutes." Am. Compl. ¶ 17.  Armed with this information and their personal experiences (summarized in the following subsection), Plaintiffs filed this class action, which Defendants removed to this Court from the Circuit Court for Baltimore City in April 2022.  *See* ECF 1.  With the benefit of discovery in this litigation, Plaintiffs calculate the median release time as eight hours and the mean more than twelve hours. Pls.' Mot. at 7.  Plaintiffs claim that more than 14,000 individuals—almost ninety percent

---

[2] Plaintiffs' Motion quotes from what it identifies as a 2019 order and memorandum opinion issued by now-United States District Judge Julie R. Rubin.  A review of the cited docket reflects that the case was filed in 2020.  Nonetheless, an October 14, 2021 memorandum and order issued by Judge Rubin resolved the case in Mr. Palmer's favor. The Court assumes this to be the relevant edict from Judge Rubin's time on the Circuit Court for Baltimore City.

of detainees—"are held longer than the 4-hour maximum [period] identified by DPSCS." *Id*. at 2.

Plaintiffs filed this Motion seeking certification of a class (and subclasses) of individuals that, by Plaintiffs' calculations, have been subjected to unconstitutional overdetention. Pls.' Mot. at 3, 26-29. The Amended Complaint alleges that "[b]ased on a representative sample of 2019 data, people presumed innocent and ordered released are held, on average, more than 14 hours after their release is ordered." Am. Compl. at ¶ 2. In 2020, the alleged average time between a release order and the release of a detainee exceeded 19 hours. *Id*. at ¶ 6. Plaintiffs further allege that other years between 2019 and the present involve excessive, unconstitutional delays in release. *See id*. at ¶¶ 6-14. For example, while many detainees were released in less than one hour—indicating release within the testifying employees' expected duration is possible—in 2020, more than 2,000 people experienced post-order delays exceeding four hours. *Id*. at ¶ 11. Plaintiffs also allege examples of "severe" overdetention at Central Booking, including detentions lasting six, eight, and 216 *days* after the relevant release order. *Id*. at ¶¶ 12-14.

If one views the Amended Complaint as an attempt to outline a painting, the Motion adds color and finer details to the canvas. Plaintiffs cite proposed expert testimony regarding the mean and median times between release being ordered and being completed. *See* Pls.' Mot. at 7-8. The findings of Plaintiffs' expert, Alan Salzberg, Ph.D., reflect that while some releases occurred in less than a half hour after a release order, the median time for post-order detention was eight hours, while the average post-order delay until release approached thirteen hours. *See id*.; *see generally* Pls.' Ex. 5, Deposition of Alan Salzberg, Ph.D., ECF 84-5.

According to Plaintiffs, the unreasonable, post-order detention periods at Central Booking cost them time, money, jobs, housing, repossession of their cars, and even custody of their children. *Id.* at 6. Moreover, Plaintiffs argue, such patterns and practices put detainees' health, physical safety, and life at risk. *Id.* Plaintiffs attribute such risk to the nature of Central Booking: on average, according to Plaintiffs, there are two serious incidents of detainee-on-detainee violence each day, to say nothing of incidents between officers and detainees. *Id.* Plaintiffs also highlight that arrestees who post bond are "preferentially released" more than twice as fast as those whose charges are dismissed. *Id.* at 6-7.

### C. NAMED PLAINTIFFS' ALLEGATIONS

The allegations recite the four named plaintiffs' respective experiences to support their claim that "Black people are disproportionately over detained the longest and have been for at least every year since 2019[.]" Am. Compl. at ¶ 35. First, Mr. Palmer alleges that he was arrested on a warrant and unreasonably detained for almost 22 hours. *Id.* at ¶ 65. A court ordered Mr. Palmer's release on March 15, 2019, at 3:33 p.m., but he remained detained until 1:30 p.m. on March 16, 2019—21 hours and 57 minutes after the court declared he be freed. *Id.* at ¶¶ 61-65. Second, Mr. Wilson alleges that his unlawful detention approached 18 hours: a court ordered his release on or about November 29, 2021, at 9:00 a.m., yet he was not released until 6:00 a.m. the next day. *Id.* at ¶¶ 72-75. Third, Mr. Rogers alleges that he was arrested on a false allegation and detained for almost 90 hours after a court required his release. *Id.* at ¶¶ 82-84. The court ordered Mr. Rogers' release on December 20, 2019, at 8:00 a.m., but he remained in custody until around 4:00 a.m. on December 24, 2019. *Id.* at ¶ 83. Last, Ms. Elmore alleges that she was unlawfully detained for almost 12 hours. *Id.* at ¶ 95. Despite the court ordering her

release on June 7, 2019, at 8:07 p.m., the state held her until around 8:00 a.m. the following day—11 hours and 53 minutes later.  *Id.* at ¶¶ 92-94.

### D. THE PROPOSED CLASS AND SUBCLASSES

Plaintiffs' Amended Complaint outlines four potential subclasses of plaintiffs, based on the alleged theory of liability and harm suffered: a "Constitutional Class"; a "Tort Class", a "Racial Discrimination Class", and an "Innocent Class."  Am. Compl. at ¶¶ 101-04.  Plaintiffs' Motion for Class Certification, however, proposes five subclasses defined by the amount of time a putative class member endured overdetention.[3]  Plaintiffs suggest the Court use "Record Staff Approval Time" or "RS Time"—the point at which the records unit staff completes its review of the release packet—as the starting point from which to measure overdetention.  Pls.' Reply at 4.  They assert that use of the RS Time (rather than the time of the court order) eliminates from the merits analysis "any small impact of the issues raised by defense."  *Id.* at 4 n.2.  As a result, Plaintiffs structure the five proposed

---

[3] Because the Amended Complaint's class proposal differs from the one in the Motion, Defendants ask the Court to "strike with prejudice the class allegations and prayer from class-wide relief contained in the amended complaint."  Opp'n at 36.  Defendants, however, do not offer any legal basis to support this demand, and Plaintiffs do not address this issue in their Reply.  The Court finds it unnecessary to strike from the pleadings any allegations related to class definitions.  Modification of the proposed definitions is not necessarily improper, as that may be a natural result of the "ongoing refinement and give-and-take inherent in class action litigation, particularly in the formation of a workable class definition."  *In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004); *see also Piotrowski v. Wells Fargo Bank, NA*, No. DKC-11-3758, 2015 WL 4602591, at *5 (D. Md. July 29, 2015) (focusing on whether plaintiffs' proposal satisfies Rule 23 rather than whether it tracks the complaint's allegations).  And the Court's ruling on the Motion (and any subsequent adjustments to that ruling) will govern the class definition; the allegations in the Amended Complaint cannot supersede or displace the Court's order.  *See* Fed. R. Civ. P. 23(c)(1)(B).  Therefore, absent meaningful argument or authority suggesting that striking the allegations is necessary or meaningful after a certification order issues, the Court declines Defendants' request.  *Cf. Henderson v. Corelogic Nat'l Background Data, LLC*, No. 3:12-cv-97, 2016 WL 4611571, at *4 (E.D. Va. Sept. 2, 2016) ("the Court will consider the class definitions and proposed sub-classes set forth in Plaintiffs' certification motion without requiring any amendment of the Complaint").

subclasses based on duration between the RS Time and actual release from custody.  Pls.'
Mot. at 26.  Plaintiffs claim that these five subclasses reflect and capture legal and factual
issues common to all potential class members and claims, thus rendering those issues
appropriate for classwide treatment.  In total, the proposed subclasses involve 14,249
allegedly unconstitutional detentions, divided as follows pursuant to Rule 23(c)(5):

> Subclass A: Class Members who were detained for more than 2 hours, but
> equal to or less than 2.5 hours, after the RS Time.  [919 detentions]
>
> Subclass B: Class Members who were detained for more than 2.5 hours, but
> equal to or less than 3 hours, after the RS Time.  [1,226 detentions]
>
> Subclass C: Class Members who were detained for more than 3 hours, but
> equal to or less than 3.5 hours, after the RS Time.  [1,072 detentions]
>
> Subclass D: Class Members who were detained for more than 3.5 hours, but
> equal to or less than 4 hours, after the RS Time.  [1,226 detentions]
>
> Subclass E: Class Members who were detained over 4 hours after the RS
> Time.  [9,806 detentions]

*Id*. at 27-28.  Plaintiffs seek certification pursuant to Rule 23(b)(2) for purposes of
injunctive relief and under Rule 23(b)(3) for purposes of monetary relief because the class
issues predominate over the individual issues.  *Id*. at 29.  Additionally, the plaintiffs ask
that the class be certified as an "opt-out" class, pursuant to Rule 23(c)(1).  *Id*. at 26.

## II.    STANDARD OF REVIEW

Class actions provide a representative party with the opportunity to prosecute in a
single action both their claims and the claims of others similarly situated.  *See, e.g.*, *Thorn
v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 318 (4th Cir. 2006).  Plaintiffs seeking to
certify a class must first satisfy the requirements of Federal Rule of Civil Procedure 23(a).
*Id*.  Subtitled "Prerequisites," Rule 23(a) provides that:

> One or more members of a class may sue or be sued as representative parties
> on behalf of all members only if:

     (1)   the class is so numerous that joinder of all members is impracticable;

     (2)   there are questions of law or fact common to the class;

     (3)   the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

     (4)   the representative parties will fairly and adequately protect the interests of the class.

In addressing these four issues, courts and litigants often employ the common shorthand of numerosity, commonality, typicality, and adequacy. See *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir. 2019) (citing Fed. R. Civ. P. 23(a)). In this circuit, Rule 23(a) contains an "implied requirement of 'ascertainability,' meaning that the Court 'can readily identify the class members in reference to objective criteria.'" *McMillian v. Kansas City Live Ins. Co.*, 762 F. Supp. 3d 443, 457 (D. Md. 2025) (quoting *Krakauer*, 925 F.3d at 654 (citation omitted)).

After clearing these threshold requirements, the plaintiff must demonstrate that the class action falls within one of the three categories enumerated in Rule 23(b). *Krakauer*, 925 F.3d at 655 (citation omitted). Here, Plaintiffs invoke two of these categories: Rule 23(b)(2)'s injunctive relief provision and Rule 23(b)(3)'s provision for where common questions of law or fact predominate over the individual issues of the proposed class members. Pls.' Mot. at 29. A putative class plaintiff bears the burden to establish by a preponderance of evidence each Rule 23 requirement. *Gov't Emps. Health Ass'n v. Actelion Pharms. Ltd.*, No. GLR-18-3560, 2024 WL 4122123, at *9 (D. Md. Sept. 6, 2024) (citing *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008)). Additionally, "'[c]ertification is only concerned with the commonality (not the apparent merit) of the claims and the existence of a sufficiently numerous group of persons who may assert those claims.'" *Brown v. Nucor Corp.*, 576 F.3d 149, 152 (4th Cir.

9

2009) (internal quotation marks and citation omitted).  Therefore, "'[w]hen deciding a motion for class certification, a district court does not accept the plaintiff's allegations in the complaint as true; rather, an evidentiary hearing is typically held on the certification issue.'" *Monroe v. City of Charlottesville, Va.,* 579 F.3d 380, 384 (4th Cir.2009) (citations omitted).

## III.  DISCUSSSION

### A. PLAINTIFFS MEET THE IMPLIED REQUIREMENT OF "ASCERTAINABILITY" UNDER RULE 23(A).

On Rule 23 motions in this circuit, courts first consider the implicit threshold requirement that "the members of a proposed class be readily identifiable[,]" or "ascertainable."  *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (quoting *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972)).  To satisfy this requirement, the class "must exist and be 'readily identifiable' or 'ascertainable' by the court through 'objective criteria.'"  *Amaya v. DGS Constr., LLC*, 326 F.R.D. 439, 446 (D. Md. 2018) (quoting *EQT*, 764 F.3d at 358).  If the "class members are impossible to identify without extensive and individualized fact-finding or mini-trials," then the class will not be certified.  *EQT*, 764 F.3d at 358 (internal quotation marks and citations omitted); *see also Amaya*, 326 F.R.D. at 446.

Defendants insist that there is no ascertainable class because "plaintiffs cannot identify which individuals' detentions pending completion of the release process qualify as allegedly unconstitutional or in violation of state law without first undergoing a case-by-case review into the factual circumstances of each individual's release."  Opp'n at 15.  Further, they argue that proposed class membership turns on how long a detainee was held without a basis for finding that a violation of any rights occurred.  *Id.* at 15-16.

Plaintiffs counter that the class is readily identifiable because at least 14,249 individuals were detained for more than two hours after record staff approval (i.e., "RS Time").  Pls.' Mot. at 26.  Plaintiffs identify the potential class members as individuals detained between 2019 and 2021.  *Id.*  They maintain that the year of any given detention is readily identifiable, objective information obtainable from Central Booking's records.  The Court agrees and finds that Plaintiffs meet the threshold requirement of ascertainability.

### B. PLAINTIFFS SATISFY RULE 23(A)'S REQUIREMENTS.

Having cleared the threshold hurdle of ascertainability, Plaintiffs must demonstrate numerosity, commonality, typicality, and adequacy of representation of their proposed class.  They succeed in this endeavor as well.

#### 1. NUMEROSITY

Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  There is no minimum number needed to maintain a class action, but, generally, "a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone." *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021) (internal quotation marks and citation omitted); *see also Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 556 (D. Md. 2006) (recognizing authority reflecting that as few as forty members sufficiently large to make joinder impracticable and, as a result, finding numerosity met based on plaintiffs' estimate that the proposed class exceeded forty people).

Plaintiff's potential class includes at least 14,249 members.  Pls.' Mot. at 26. Defendants do not contest this.  With ease, Plaintiffs meet the numerosity requirement.

## 2. COMMONALITY & TYPICALITY

Commonality exists when "prospective class members share the same central facts and applicable law." *Starr v. VSL Pharms., Inc.*, No. LKG-19-02173, 2025 WL 1258016, at *6 (D. Md. Apr. 30, 2025) (citations omitted). A single common question will suffice if it is "of such a nature that its determination 'will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *EQT*, 764 F.3d at 360 (quoting *Wal-Mart v. Dukes*, 564 U.S. 338, 350 (2011)); *D.N.N. v. Baker*, No. JRR-25-01613, 2025 WL 2098633, at *12 (D. Md. July 25, 2025) (same). "A question is not common . . . if its resolution 'turns on a consideration of the individual circumstances of each class member.'" *Thorn*, 445 F.3d at 319 (quoting 7A Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1763 (3d ed. 2005)). Rather, the plaintiff must show that the claims depend on a common contention of "'such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *CASA, Inc. v. Trump*, 793 F. Supp. 3d 703, 718 (D. Md. 2025) (quoting *Dukes*, 564 U.S. at 350). Put differently, "the class action must have 'the capacity . . . to generate common *answers* apt to drive the resolution of the litigation.'" *Id.* (quoting *Dukes*, 564 U.S. at 350) (emphasis in original).

Typicality exists where the class representatives are "'part of the class and possess the same interest and suffer the same injury as the class members.'" *Dieter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (quoting *Gen. Tel. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)); *see also CASA*, 793 F. Supp. 3d at 722 ("[T]ypicality is met if no differences 'strike[] at the heart of the respective causes of actions.'" (quoting *Dieter*, 436 F.3d at 467) (alteration in original)). "In analyzing this question, a court compares the class

12

representative's claims and defenses to those of the absent class members, considers the facts needed to prove the class representative's claims, and assesses the extent to which those facts would also prove the claims of the absent class members." *Amaya*, 326 F.R.D. at 447 (citing *Dieter*, 436 F.3d at 466-67). Thus, to meet the typicality requirement, the representative's and class members' claims "do not have to be perfectly identical or perfectly aligned," but they must have "arise[n] from the same event, practice, or course of conduct . . . and be based on the same legal theory." *CASA*, 793 F. Supp. 3d at 722 (internal quotation marks and citations omitted). The named plaintiff's claim "cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of [their] own individual claim." *Dieter*, 436 F.3d at 466-67. In short, "as goes the claim of the named plaintiff, so go the claims of the class." *Dieter*, 436 F.3d at 466 (quoting *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998)). Due to the similarities in the inquiries, typicality often goes hand in hand with commonality. *See Falcon*, 457 U.S. at 157 n.13 ("The commonality and typicality requirements of Rule 23(a) tend to merge."); *CASA*, 793 F. Supp. 3d at 722 (collecting authority noting convergence of inquiries).

Here, Plaintiffs argue that commonality exists because the same course of events—the alleged "unconstitutional practice[s] of overdetention" at Central Booking—led to the same injury, the deprivation of Plaintiffs' liberty. Pls.' Mot. at 31. Defendants counter that although the Plaintiffs were allegedly overdetained, "the variation in the putative claims of the class members is fatal to any finding of typicality." Opp'n at 28. Defendants insist that "both the causes and consequences of delay will vary from arrestee to arrestee and these variations will affect the claims of putative class members against the Defendants." *Id.* at 27. Further, Defendants contend, these variations will impact their

13

defenses as well as the measurement of each putative class member's damages, if any. *Id.* Defendants also contend that Plaintiffs have not "even established an appropriate constitutional benchmark" for detention, which, they believe, is necessary for any claims presented. *Id.* at 29.

In Plaintiffs' eyes, Defendants' "laundry lists of issues it claims may contribute to delays in any given case" lack meaningful, concrete reasons class treatment is inappropriate. Pls' Reply at 11. According to Plaintiffs, the two primary sources of delay (delays during the supervisor's review and during the mandatory medical visits) account for more than 60% of the time involved in releasing someone; therefore, Plaintiffs insist, these "issues predominate and a class should be certified." *Id.* at 10. Additionally, Plaintiffs characterize much of Defendants' "laundry lists" as "petty issues" that only confuse matters.[4] *Id.* at 11-16.

The class representative and class members all suffer the same alleged injury: unconstitutional overdetention. While the details of their overdetention may vary, the issue of Central Booking's alleged unconstitutional practices (leading to excessively long post-release order detention) predominates over any of the individualized concerns raised by Defendants. As explained above, the claims of each class member do not need to be identical; their injuries need only to be based on the same practice and the same legal theory. *See CASA*, 793 F. Supp. 3d at 719 ("[M]inor differences are no bar to finding commonality because the injury at the core of their claims . . . is common to all of them.");

---

[4] One of the defense contentions that Plaintiffs reference is the potential impact of verifying and correcting court paperwork. Because that process happens before the first computer entry at Central Booking, Plaintiffs suggest that potential variable is accounted for by measuring overdetention beginning with RS time rather than the time of the court's release order. Pls.' Reply at 12.

*Wilson v. Eagle Nat'l Bank*, No. JRR-20-1344, 2023 WL 2478933, at *11 (D. Md. Mar. 13, 2023) ("'Minor differences in the underlying facts of individual class members' cases do not defeat a showing of commonality where there are common questions of law.'" (quoting *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 216 (D. Md. 1997))). Regardless of any individual considerations Defendants suggest, Plaintiffs share a common legal theory: whether the alleged practice of overdetention at Central Booking deprived class members of their constitutional rights. Because the class representatives and the class members share a common injury, and the resolution of a common question of law will resolve their claims, commonality and typicality exist here. *See CASA*, 793 F. Supp. 3d at 722 (finding typicality "satisfied for the same reasons commonality is satisfied").

### 3. ADEQUACY OF REPRESENTATION

Rule 23(a) also requires a finding that the named plaintiffs will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 597, 625 (1997). When assessing adequacy of representation, courts look to "(1) whether the named plaintiffs . . . have any conflicts of interest with other class members; and (2) whether the named plaintiffs . . . will prosecute the action vigorously on behalf of the entire class." *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 150 (D. Md. 2022), *vacated and remanded sub nom.*, 78 F.4th 677 (4th Cir. 2023) (ellipses in original);[5] *see also*

---

[5] On remand, Judge Grimm's 2022 certification was reinstated. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 345 F.R.D. 137 (D. Md. 2023). The Fourth Circuit reversed the recertification as well. *Maldini v. Marriott Corp., Inc.*, 140 F.4th 123 (4th Cir. 2025). Because those appellate rulings turned on the applicability of contractual

*McMillian*, 762 F. Supp. 3d at 467 (examining (1) qualifications and experience of class counsel and (2) "whether the representative's claims are sufficiently interrelated and not antagonistic with the class claims as to ensure fair and adequate representation"); *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 315 (E.D. Va. 2007) (distilling inquiry to whether plaintiff will "vigorously prosecute the claims asserted" and has "the requisite credibility to ensure that he will act as a fiduciary with respect to the class"); *Starr*, 2025 WL 1258016, at \*14 (looking to whether "the interest of the plaintiff and other members of the class [] coincide" and whether the "plaintiff and his attorney will vigorously prosecute the action" (internal quotation marks and citation omitted));. The first prong focuses on whether there is a "*fundamental* conflict of interest" with other class members. *Sharp Farms v. Speaks*, 917 F.3d 276, 295 (4th Cir. 2019) (emphasis added). Like the typicality requirement, "'[a] conflict is not fundamental when . . . all class members share common objectives and the same factual and legal positions [and] have the same interest in establishing the liability of [defendants].'" *Id.* (internal quotation marks and citation omitted); *CASA*, 793 F. Supp. 3d at 723 (same). A "class representative must be part of the class" and, like the typicality requirement, "'possess the same interest and suffer the same injury' as the class members." *Sharp Farms*, 917 F.3d at 295 (quoting *Amchem*, 521 U.S. at 26.)

Plaintiffs contend that the named individuals "have fought for years to defend and protect the claims of their fellow (potential) class members." Pls.' Mot. at 31. Defendants

---

waivers, *see id.* at 126, the Court credits the 2022 opinion's summation of the law on Rule 23(a)(4) as accurate and reflective of appropriate principles. *See also D.N.N.*, 2025 WL 2098633 at \*10-12 (quoting the same passage from the 2022 *In re Marriott* opinion setting forth Rule 23(a) legal framework).

posit that Plaintiffs fail to demonstrate adequacy for two reasons.  Defendants insist the named plaintiffs do not demonstrate harmony between their and the unnamed class members' interests regarding damages.  Second, Defendants claim that Plaintiffs do not adequately account for variations in damages based on individual considerations such as physical or emotional damages arising from unique circumstances, loss of consortium, or wage losses that would vary on a person-to-person basis.  Opp'n at 31.

True enough, Plaintiffs do not seek individualized damages; they seek only a flat rate compensation correlating to the time lost while allegedly overdetained.  In such a damages scheme, there is no conflict of interest between the class representatives and the class members.  The Court is persuaded that all representatives and potential class members share the same injury and the same interests.[6]  Considering the existence of commonality and typicality among the named plaintiffs' interests and those of the class members, the Court finds no hesitation in deeming the named plaintiffs as adequate representatives.  *See Deiter*, 436 F.3d at 466 (typicality "tends to merge with the commonality and adequacy-of-representation requirements"); *McMillan*, 762 F. Supp. 3d at 467 ("adequacy overlaps with commonality and typicality").

---

[6] The potential variables articulated by Defendants do not create a conflict between the class representatives and the unnamed class members.  To the extent any individual seeks to litigate and recover damages requiring individual consideration, such members could pursue relief on an individual basis in lieu of class participation.  *See, e.g., Gunnells v. Healthplan Servs. Inc.,* 348 F.3d 417, 433 (4th Cir. 2003) (noting that the opt-out provisions applicable to Rule 23(b)(3) classes avoid forcing any class members to forgo their wish to pursue claims "requiring more individualized inquiry"); *Souter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 212 (E.D. Va. 2015) ("it remains true that any class members who wish to litigate actual damages retain the right to opt-out pursuant to Rule 23(c)(2)").

The named plaintiffs are not the only participants assessed for adequacy. Counsel, too, receive scrutiny to ensure fair and proper representation. *See, e.g.*, *McMillian*, 762 F. Supp. 3d at 467. In appointing class counsel, the Court must consider

> (i) the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and
>
> (iv) the resources that counsel will commit to representing the class[.]

Fed. R. Civ. P. 23(g)(1)(A). Plaintiffs' counsel first became involved in developing this case as early as 2019 during the MPIA Litigation and thus appear to have at least six years of familiarity with the first-named plaintiff, Mr. Palmer, and facts and legal theories central to this case (as they were invoked in seeking state documents). Counsel also present their years of experience litigating cases, including serving as counsel in a class action filed in 2015 in this District. *See* Amended Complaint, *Smith, et al., v. Housing Auth. of Balt. City, et al.,* No. GLR-15-2921, ECF 15 (D. Md.) (filed Nov. 13, 2015).[7] Upon review of the background of this action, counsels' filings, and the representations at the hearing, the Court finds that Plaintiffs' Counsel will adequately prosecute the claim on behalf of the entire class.

### C. CERTIFICATION UNDER 23(B)

Finding the Rule 23(a) requirements satisfied, the Court proceeds to whether the proposed classes align with a Rule 23(b) classification. Here, Plaintiffs offer that the classes should be certified under both Rule 23(b)(2) and Rule 23(b)(3). The Court agrees

---

[7] *Smith* concluded with a class settlement. *See* Order, *Smith, et al., v. Housing Auth. of Balt. City, et al.,* No. GLR-15-2921, ECF 38 (D. Md. Oct. 7, 2016).

but only in part.  Plaintiffs have not met the requirements to be certified under Rule 23(b)(2) but achieve certification under Rule 23(b)(3).

### 1. CLASS CERTIFICATION UNDER RULE 23(B)(2) – INJUNCTIVE RELIEF

Rule 23(b)(2) permits certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Dukes*, 564 U.S. at 360 (internal quotation marks and citation omitted).  More succinctly, Rule 23(b)(2) applies only where the requested injunction "would provide relief to each member of the class."  *Id*.  If individual class members would be entitled to different injunctions against the defendant(s) based on individual circumstances or considerations, Rule 23(b)(2) certification is inappropriate.  *Id*.

Plaintiffs argue that "Defendants' practice and custom of overdetaining people is unconstitutional and . . . affect persons on a class-wide basis."  Pls.' Mot. at 36.  This argument emphasizes named plaintiff Deshawn Wilson's status as a "recidivist," averring that injunctive relief is required to protect him and other class members from suffering the same harm in the future.  *Id*. at 36-37.  Citing *Dukes*, Defendants respond that class-wide injunctive relief cannot combine with individualized damages.  *See* Opp'n at 32.  Notwithstanding the potential merit of Defendants' contention,[8] injunctive relief is not

---

[8] At least one decision from this District interprets *Dukes* as barring injunctive relief where a class also seeks monetary damages, but other circuits may not read *Dukes* to impose such a limitation.  *Compare Stanley v. Cent. Garden & Pet Corp*., 891 F. Supp. 2d 757, 771 (D. Md. 2012) (finding that the Supreme Court made clear that Rule 23(b)(2)

proper here.  To be certified as a Rule 23(b)(2) class, the requested injunction must benefit *all* members of the class.  Even if the Court accepted, *arguendo*, that being a "recidivist" warrants injunctive relief,[9] nothing indicates that *all* members of the class will or are likely to be detained again.  It is telling that Plaintiffs offer only one of the four named Plaintiffs as an example; this offers little comfort that the recidivism argument—upon which Plaintiffs' (b)(2) argument appears to rest—would apply to even all the named plaintiffs, to say nothing of each of the thousands of unnamed class members.  Rule 23(b)(2) certification is not appropriate.

### 2. CERTIFICATION UNDER RULE 23(B)(3) – COMMON QUESTION OF LAW OR FACT

The analysis for a Rule 23(b)(3) certification compels a different conclusion.  That provision states that a class may be certified where:

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

---

applies "only when a single injunction or declaratory judgment would provide relief to each member of the class . . .  [I]t does not authorize class certification when each class member would be entitled to an individualized award of money damages.") with *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 372 (7th Cir.) (finding that *Dukes* "left intact the authority to provide purely incidental monetary relief in a (b)(2) class").

[9] Left for another day (and, perhaps, a different case) are how a court might define and a factfinder might find what constitutes "recidivism" that would make future detention—and classwide treatment—likely for the purpose seeking injunctive relief for past overdetentions.

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Two key inquiries guide the Rule 23(b)(3) certification examination: (1) whether the questions of law or fact common to the class members predominate over any questions that affect only individual members; and (2) whether class action is the superior method of adjudication. *Jones v. Murphy*, 256 F.R.D. 519, 522-23 (D. Md. 2009). "The predominance requirement is similar to but 'far more demanding' than Rule 23(a)'s commonality requirement." *Id.* at 523 (quoting *Amchem*, 521 U.S. at 623-24). Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623; *Murphy*, 256 F.R.D. at 523. The superiority requirement examines whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3); *Murphy*, 256 F.R.D. at 523. To determine whether a class action is the superior method of litigation, courts consider: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions;" (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members;" (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

Here, Defendants contest only whether Plaintiffs' satisfy Rule 23(b)(3)'s predominance requirement. Opp'n at 32-36. Though Defendants do not challenge whether a class action is the superior form of litigation in this circumstance, the Court addresses the four superiority factors briefly. First, Plaintiffs do not seek damages

tethered to individualized harms such as loss of wages or emotional harm flowing from overdetention.  Nothing before the Court suggests that the per-plaintiff damages, using this standardized, flat rate approach, would be so substantial as to justify a significant number of class members seeking to control this case or pursue these claims on their own.  *Cf. Murphy*, 256 F.R.D. at 524 (finding superiority based on the parties' "acknowledge[ment] that a number of class individuals who were allegedly overdetained stand to recover only a small amount of damages" and, as a result, that individual litigation would not be "economically efficient" for most class members).  Second, as reflected in briefing, Plaintiffs have already spent a considerable amount of time and expense in the fact and expert discovery phases of the litigation.  This factor also weighs towards superiority.  Third, the alleged harms having all occurred within Baltimore City, "litigation of all class members' claims in the present forum is appropriate."  *Murphy*, 256 F.R.D. at 524.  Fourth, there are 14,249 potential class members identifiable with relative ease; managing that number of individual cases presents far greater inefficiencies, potential challenges, and costs than a single class action.  *See Murphy*, 256 F.R.D. at 524 ("given the relatively straightforward task of identifying class members, the court is satisfied that no significant management issues will arise if this action is maintained as a class").  Class litigation also avoids inconsistencies of thousands of separate lawsuits asking the questions common to all class members.  *See Gunnells*, 348 F.3d at 427 ("Class certification thus promotes consistency of results, giving defendants the benefit of finality and repose."); *Soutter*, 307 F.R.D. at 218 (citing *Stillmock v. Weis Markets*, 385 F. App'x 267, 275 (4th Cir. 2010)).  The Court lacks any doubt that a class action is the superior form of litigation for the pending claims.

22

Convinced that a class action is superior to individual litigation in this case, the Court turns to the issue of predominance.  Rule 23(b)(3)'s test is qualitative rather than quantitative.  *Gunnells,* 348 F.3d at 429.  That is, "[t]his is not simply a matter of counting common versus noncommon questions and checking the final tally."  *Soutter*, 307 F.R.D. at 214.  The Court must remain mindful that

> [a]n individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (alteration in original) (internal quotation marks and citation omitted).  "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."  *Id.* (internal quotation marks and citation omitted).

Therefore, if the common questions predominate any individual ones, predominance exists; it is not necessary that the court find a complete absence of individual issues.  *See, e.g., Stillmock*, 385 F. App'x at 273 ("[W]here, as here, the qualitatively overarching issue by far is the liability issue of the defendant's willfulness, and the purported class members were exposed to the same risk of harm every time the defendant violated the statute in the identical manner, the individual statutory damages issues are insufficient to defeat class certification under Rule 23(b)(3)."); *Murray v. GMAC Mortg. Corp.,* 434 F.3d 948, 953 (7th Cir. 2006) ("Refusing to certify a class because the plaintiff decides not to make the sort of person-specific arguments that render class treatment infeasible would throw away the benefits of consolidated

treatment.  Unless a district court finds that personal injuries are large in relation to statutory damages, a representative plaintiff must be allowed to forego claims for compensatory damages in order to achieve class certification."); *Smilow v. Sw. Bell Mobile Sys., Inc.,* 323 F.3d 32, 40 (1st Cir.2003) ("The individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3).  Where, as here, common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain." (citations omitted)); *In re Marriott*, 341 F.R.D. at 155 ("Rule 23(b)(3) does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof, but it does require that common questions predominate over any questions affecting only individual class members." (internal quotation marks, citations, and alterations omitted)).

In that vein, Plaintiffs insist that there are no individual issues of liability in this case.  Pls.' Mot. at 37.  Their harm, they allege, flows not from unique facts requiring review of individual treatment but from a more easily discernible fact: the number of hours they were overdetained based on RS Time to actual release.  *Id*. This leaves, in Plaintiffs' view, only two fundamental issues susceptible to classwide determination by the factfinder: (1) at what point does the delay in releasing people become unreasonable; and (2) the value of each hour of overdetention.  *Id*. at 38.

In strident opposition, Defendants counter that even if some unreasonable overdetention occurred, "individualized issues predominate because each release has a far 'greater number of questions peculiar' to its circumstances and characteristics than it has cohesive or representative similarities shared among a putative class."  Opp'n at 32 (citing *Amchem* 521 U.S. at 623-624).  Defendants offer three cases from within the

24

Seventh Circuit to illustrate their position.  Opp'n at 33-36.  In *Harper v. Sheriff of Cook County*, the Seventh Circuit reversed certification for a group of individuals alleging overdetention by a sheriff's office.  581 F.3d 511, 514-15 (7th Cir. 2009).  According to the *Harper* court, the constitutionality of each detention depended on the reasonableness of the delay on a case-by-case basis.  *Id.* at 515.  Relying on *Harper*, a district court denied class certification for detainees because the plaintiff "fail[ed] to explain how any of the specific detention procedures he challenged are unconstitutional 'unless [they] take [] an unreasonable amount of time or [are] done in some unreasonable manner.'"  *Otero v. Dart*, 301 F.R.D. 276, 283 (N.D. Ill. 2013) (citing *Harper*, 581 F.3d at 516).

Defendants acknowledge that in *Driver v. Marion County Sheriff*, 859 F.3d 489 (7th Cir. 2017), the Seventh Circuit deemed class treatment appropriate because there was a specific policy or practice that caused the unconstitutionally unreasonable detentions plaintiffs challenged.  *See* Opp'n at 34.  Defendants insist Plaintiffs' approach is distinguishable because "the individual considerations of more than 14,000 proposed class plaintiffs cannot be reduced to a simple hourly calculation."  *Id.* at 36.  Defendants urge that the reasonableness of a detention pending release cannot be evaluated without individualized examination of various factors related to both liability and damages, "making these claims wholly unsuitable for class relief."  *Id.*

Unsurprisingly, Plaintiffs claim that *Driver* supports their position and encourages the Court to rely on *Murphy*.  In *Murphy*, Judge Blake certified a class action for overdetention at Central Booking.  Certification in *Murphy* rested not on an overdetention theory identical to the one in this case; the central issue in *Murphy* was that individuals were detained for more than 48 hours without presentment in violation of Maryland law and, as a result, subject to unlawful searches during their

25

unlawful detention.  256 F.R.D at 523-26.  Plaintiffs emphasize that *Murphy* certified

a class notwithstanding defense arguments regarding individualized inquiries into

legitimate reasons for lengthy detention and differences in damages.  Pls.' Mot. at 39-

40.  The Court agrees that as long as the issues susceptible to classwide treatment

predominate relevant individual questions for some members, certification is proper.

*See, e.g.*, *Tyson Foods*, 577 U.S. at 453; *Stillmock*, 385 F. App'x at 273; *Murray*, 434

F.3d at 953.

Driver bolsters the conclusion that Plaintiffs' liability theory is both susceptible

to classwide treatment and predominates any potential individual issues.  Like in

*Driver*, Plaintiffs argue that class certification should be based on "the Warden's

failure to enforce the policy governing the [review of release records and paperwork]

and the practice of forced visits with State medical providers."  Pls.' Reply at 28.  This

focus more on practice and procedure than the individual differences fatal to *Harper*

persuades the Court that class treatment is proper.

Judge Hurson's recent canvassing of relevant authority is worth repeating:

"In a Rule 23(b)(3) class action like this one, 'the "commonality" requirement of Rule 23(a)(2) is 'subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over' other questions.'" *1988 Trust for Allen Child v. Banner Life Ins. Co.*, 28 F.4th 513, 522 (4th Cir. 2022) (quoting *Lienhart*, 255 F.3d at 146 n.4); *see also Amchem Prods.*, 521 U.S. at 609, 117 S. Ct. 2231.  "So 'the mere fact that the defendants engage in uniform conduct is not, by itself, sufficient to satisfy' the commonality requirement here." *1988 Tr. for Allen Child. Dated 8/8/88*, 28 F.4th at 522 (quoting *EQT Prod. Co.*, 764 F.3d at 366).  "Rather, in a Rule 23(b)(3) case, '[t]he predominance inquiry focuses not only on the existence of common questions, but also on how those questions relate to the controversy at the heart of the litigation.'" *Id.* (quoting *EQT Prod. Co.*, 764 F.3d at 366). Predominance "calls upon courts to give careful scrutiny to the relation between common and individual questions in a case." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453, 136 S. Ct. 1036, 194 L. Ed. 2d 124 (2016).  "An individual question

is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Id.* (alterations in *Tyson Foods*) (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196-197 (5th ed. 2012)).

*McMillan*, 762 F. Supp. 3d at 460.  In previous cases, the Fourth Circuit has "flatly held that 'when the defendants' affirmative defenses . . . may depend on facts peculiar to each plaintiff's case, class certification is erroneous.'"  *Gunnells*, 348 F.3d at 438 (quoting *Broussard,* 155 F.3d at 342).  However, while this may be a stricter approach than in other circuits, "this does not mean that just any individualization will defeat predominance." *McMillian*, 762 F. Supp. 3d at 464 (citing *In re Marriott*, 341 F.R.D. at 157).  "To defeat class certification, a defendant must show some degree of likelihood a unique defense will play a significant role at trial."  *Id.* (quoting *In re Zetia*, 7 F.4th at 237).  Defendants have not done so here.

Additionally, "[i]ndividualized damage determinations also do not preclude the conclusion that common questions of law and fact predominate."  *Stanley*, 891 F. Supp. 2d at 771 (citing *Gunnells,* 348 F.3d at 428; and then citing *Ward v. Dixie Nat'l Life. Ins. Co.,* 595 F.3d 164, 180 (4th Cir. 2010)).  The Court is mindful that even if putative class plaintiffs demonstrate liability is susceptible to classwide treatment, they must "establish[] that damages are capable of measurement on a classwide basis."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013); *see also In re Marriott*, 341 F.R.D. at 161. Defendants contends that Plaintiffs lack a "valid methodology, using common proof" to determine damages.  Opp'n at 36.  The Court disagrees.  Plaintiffs' proposal involves (1) a factfinder assigning a value for each increment of time overdetained and (2) classes based on duration of overdetention.  Even if the *calculation* for each class member is individual,

27

the method proposed by Plaintiffs satisfies, at this stage, the requirement that damages are capable of classwide *measurement*. *See Comcast*, 569 U.S. at 34; *In re Marriott*, 341 F.R.D. at 161.

Based on the analysis above, the Court finds that Plaintiffs have largely satisfied the predominance requirement. Though there may be some individualization in the circumstances of each class member's alleged overdetention, the individual considerations are not so substantial that they defeat predominance. Plaintiffs have established that, in this case, there are two predominant questions of fact: (1) at what point does the delay in releasing people from detention become unreasonable; and (2) the value of each hour of overdetention. Pls.' Mot. at 38. Individual concerns or circumstances do not overpower these common questions. Additionally, Plaintiffs have proposed a damages model that mitigates the concern that certain individual circumstances will overwhelm the common queries.

Plaintiffs' proposed classes separate the class members into five groups based on hours they were allegedly overdetained:

> Subclass A: those detained for more than 2 hours but equal to or less than 2.5 hours after RS time;
>
> Subclass B: those detained for more than 2.5 hours, but equal to or less than 3 hours after RS time;
>
> Subclass C: those detained for more 3 hours, but equal to or less than 3.5 hours after RS time;
>
> Subclass D: those detained for more than 3.5 hours, but equal to or less than 4 hours after RS time; and
>
> Subclass E: those detained for more than 4 hours after RS time.

Pls.' Mot. at 27-28. By starting the overdetention clock after the RS time, all class members will be similarly positioned; any individual variations related to initial

processing or paperwork errors are reduced significantly, if not eliminated completely, by this approach.  Still, Defendants suggest that some individual circumstances may affect detainees' ultimate release time (and thus the reasonableness of their detentions). However, public documents obtained by the Plaintiffs in the MPIA Litigation, in addition to other testimony, suggest that regardless of individual circumstances, the release process should average approximately 2.5 hours after a court orders release and should not exceed four hours.

At this juncture, the Court finds that Plaintiffs have met the requirements for class certification under Rules 23(a) and 23(b)(3).  But some adjustments to Plaintiffs' benchmarks are necessary.  Defendants harp on, among other things, the potential that individual circumstances during the release process affect release timing.  In Defendants' view, these variations may play an outsized role in the reasonableness analysis where an individual has not been detained for longer than the alleged 2.5-hour average from the RS Time.  Defendants' position has some merit with respect to the Rule 23 analysis.[10]  It raises a question as to whether detentions shorter than the alleged 2.5-hour average can be treated on a classwide basis.  However, the further a delay moves past the 2.5-hour mark, the more this becomes an issue of practice and procedure than any individual circumstance.  With this in mind, the Court exercises its discretion to modify the proposed class definitions to eliminate subclass A, to account for the impact of individualized considerations overwhelming those questions properly susceptible to class treatment.

---

[10] The Court's crediting of this argument and modification below is based solely on the consideration of what is appropriate for classwide treatment pursuant to Rule 23(b).  This modification should not be taken in any way as a view on the merits of whether a detention of 2.5 hours (or less) is reasonable.

*See Piotrowski*, 2015 WL 4602591, at *5 ("The court possesses the power to modify the class definition." (citing *Jenkins v. Massinga*, 592 F. Supp. 480, 487 (D. Md. 1984); *Peoples v. Wendover Funding, Inc.*, 179 F.R.D. 492, 497 (D. Md. 1998); and *Givens v. Van Devere, Inc.*, No. 5:11-CV-666, 2012 WL 4092738, at *15 (N.D. Ohio Sept. 17, 2012)); *Sanders v. Gladiator, Inc.*, No. 5:08-CV-555-FL, 2010 WL 11619711, at *3 n.5 (E.D.N.C. Apr. 12, 2010)(observing the court's "discretion to narrow the class definition or create sub-classes").

*   *   *

Accordingly, the Court finds that all Rule 23(a)and 23(b)(3) conditions for class certification are met.  The Court will certify a general class of all individuals detained at Central Booking for more than 2.5 hours after the RS Time following an order for their release.  In addition, the Court will certify subclasses with the following amendments:

Subclass A (previously B): Class Members detained for more than 2.5 hours, but equal to or less than 3 hours, after the RS Time.  [1,226 detentions]

Subclass B (previously C): Class Members detained for more than 3 hours, but equal to or less than 3.5 hours, after the RS Time.  [1,072 detentions]

Subclass C (previously D): Class Members detained for more than 3.5 hours, but equal to or less than 4 hours, after the RS Time.  [1,226 detentions]

Subclass D (previously E): Class Members detained longer than 4 hours after the RS Time.  [9,806 detentions].

If adjustment to these definitions becomes necessary for any legal, administrative, or other reason, the Court may revisit these definitions.  *See* Fed. R. Civ. P. 23(c)(1)(C); *Wilson*, 2023 WL 2478933, at *21.

30

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Class Certification is **GRANTED** with the amendments to the class definitions noted herein.  A separate order consistent with this opinion will issue.


Date: June 24, 2026

_____/s/_____
Charles D. Austin
United States Magistrate Judge
